2026 IL App (1st) 252639

No. 1-25-2639B

March 27, 2026

FIFTH DIVISION

---

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

---

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | 25 CR 12904 |
| | ) | |
| JOEL REYES, | ) | The Honorable |
| | ) | Ankur Srivastava, and |
| Defendant-Appellant. | ) | Jennifer Coleman |
| | ) | Judges, presiding. |

---

JUSTICE ODEN JOHNSON delivered the judgment of the court, with opinion
Presiding Justice Mitchell and Justice Mikva concur in the judgment and opinion.

**OPINION**

¶ 1 Defendant-appellant Joel Reyes, by and through private counsel, brings this appeal challenging (1) the trial court's order, entered October 23, 2025, by Judge Ankur Srivastava, granting the State's petition for pretrial detention, and (2) the trial court's order, entered December 1, 2025, by Judge Jennifer Coleman, denying defendant's subsequent motion for relief pursuant to Illinois Supreme Court Rule 604(h) (eff. Apr. 15, 2024). A "motion for relief" is "a prerequisite to appeal" (Ill. S. Ct. R. 604(h)(2) (eff. Apr. 15, 2024)), under what is

"commonly known as the Pretrial Fairness Act"[1] (*People v. Morgan*, 2025 IL 130626, ¶ 1). This type of motion asks the trial court to reconsider a prior denial of pretrial release. See Ill. S. Ct. R. 604(h)(2) (eff. Apr. 15, 2024).

¶ 2   Under case No. 25-CR-12904, defendant was indicted for multiple sexual assault and abuse counts of an underage victim, stemming from an incident on September 15, 2025, in the victim's home. The counts are (1) criminal sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2024)), for penetration of M.R.'s mouth by force or threat of force; (2) criminal sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2024)) for penetration of M.R.'s vagina by force or threat of force; (3) criminal sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2024)) for penetration of M.R.'s vagina by his finger by force or threat of force; (4) criminal sexual abuse (720 ILCS 5/11-1.50(a)(1) (West 2024)) by making contact with M.R.'s hand by his penis by force or use of force; and (5) criminal sexual abuse (720 ILCS 5/11-1.50(a)(1) (West 2024)) by making contact with M.R.'s body by his penis by force or use of force.

¶ 3   For the following reasons, we affirm the trial court's order denying defendant's motion for release and affirm the denial of pretrial release.

¶ 4                                    BACKGROUND

¶ 5   Defendant, who was 19 years old at the time of the offense, was arrested on October 20, 2025. On October 23, 2025, the State filed a petition for pretrial detention that alleged:

> "D is 19 y/o. V is 17 y/o. D went to V's house & on arrival, they went to the bsmt. & sat on a couch. D motioned toward his penis in an attempt to get V to touch him. V

---

[1]In 2021, the General Assembly passed two separate acts that "dismantled and rebuilt Illinois's statutory framework for the pretrial release of criminal defendants." *Rowe v. Raoul*, 2023 IL 129248, ¶ 4 (discussing Pub. Acts 101-652, § 10-255, 102-1104, § 70 (eff. Jan. 1, 2023) (amending 725 ILCS 5/art. 110)).

repeatedly told D no. D asked for a hug, then got [b]ehind V, hugged her from behind, & proceeded [to] rub his penis on her body. V told D to stop. D then took his penis out of his pants and wanted V to put her mouth on it. V said no. D grabbed V's head & pushed her head onto his penis. V closed her teeth on D's penis to get him to stop. D then grabbed V, pushed her onto the couch, & pushed V's face into the pillows. D held V down, used his other hand to pull V's pants down & D's penis penetrated V's vagina."

The State's petition sought detention on the ground that defendant "poses a real and present threat to the safety of any person or persons in the community, based on the specific articulable facts of the case."

¶ 6        A hearing on the State's petition was held on October 23, 2025, and defendant was represented by private counsel. The hearing began with the State's proffer. The assistant state's attorney (ASA) stated that the 19-year-old defendant was six feet, three inches, tall and weighed 230 pounds, while the 17-year-old victim was five feet, five inches, tall and "of a much smaller statute [*sic*]."

¶ 7        The ASA stated that defendant, who was currently in college, met the victim in connection with a junior varsity baseball team, when they were both in high school. The victim had dated one of defendant's friends. On the day in question, defendant reached out to the victim, but the victim was reluctant. After explaining to him that she was celibate, the victim allowed him to come to her house. After he arrived, they went down to the basement and sat on the couch. Defendant motioned toward his penis, in an attempt to get the victim to touch him. The victim had no interest, repeatedly told him no, and stood up. Defendant asked for a

hug, which she did. Defendant then hugged her from behind and rubbed against her, while she told him to stop.

¶ 8    The ASA stated that, when they sat back down on the couch, defendant removed his penis from his pants and wanted the victim to put her mouth on it, and she again told him no. Defendant then grabbed the victim's head and pushed her head onto his penis. Defendant used both of his hands to move her head up and down on his penis. The victim closed her teeth around his penis to get him to stop. The victim then stood up and told defendant to leave but he did not. Instead, he grabbed her, pushed her onto the couch, pushed her face into the pillows, held her down with one hand by the back of her head, used his other hand to pull down her pants and penetrated the victim's vagina. When he finished, he pulled up his pants and went upstairs.

¶ 9    The ASA stated that, during this incident, the victim's 11-year-old sister entered the basement unbeknownst to any of the parties. When the sister was interviewed by the police, she said that she heard the victim asking defendant to leave, that the victim was trying to get the boy off of her, and that the boy would not stop. After the sister went back upstairs, she later saw defendant run out of the house. The sister then went back down to the basement and saw the victim crying hysterically. The victim told the sister to get their mother, which the sister did.

¶ 10   The ASA stated that the mother came down to the basement and the victim made an immediate outcry. Statements from both the mother and sister indicate that the victim was hysterical, and they took her to the hospital. After the incident, the victim missed several days of school, she was withdrawn, she would not let others touch her about the body, she started sleeping in her parents' room, and she was having difficulty sleeping at night.

¶ 11 The ASA stated that defendant had no notable criminal background, either juvenile or adult. Although claiming the sexual acts were consensual, defendant admitted that he was at the house at that time. The ASA argued that defendant was a danger to both the victim and the community, given his violent acts in the victim's home. Defendant knows where the victim lives and is able to contact her through social media. In addition, the ASA argued that defendant posed a threat to any young girl who he came into contact with.

¶ 12 The ASA argued that GPS and electronic home monitoring were insufficient, where they would require him to remain in a home, and in a home is where these events transpired. In addition, the ASA noted that defendant would have free movement for two days. As a college student, defendant had access to young women on a daily basis.

¶ 13 Defense counsel noted that this was defendant's first arrest and that defendant was a first-generation college student on a baseball scholarship. Defendant was accompanied to court by his mother, stepfather, and aunt. Defendant splits his time between his mother's and his grandmother's home. Counsel stated that defendant and the victim had been engaged in a long-term sexual relationship and that defendant told the police that he had never been to the victim's house when they did not have sex.

¶ 14 Defense counsel stated that the original case incident report indicates that, at the hospital, the victim would not provide any details to the responding officers or to the nurse who also noted a lack of injuries. There were no bruises, no abrasions, and no ripped clothes. Counsel claimed that text messages exist and that the defense welcomed an extraction of defendant's phone. Counsel asserted that a month had gone by between the incident and defendant's arrest, indicating that he posed no threat.

¶ 15    Counsel argued that conditions could be imposed such as home confinement, with his mother or grandmother as the custodian; a no-contact order and an interim protective order; electronic home monitoring and GPS; and attending school remotely.

¶ 16    While noting that the State had the burden of proof, the trial court asked counsel if the defense had any evidence of communications that he wanted to present. Counsel said that, in a recorded interview with the police, defendant said that he and the victim used to date regularly, and defendant volunteered to let the police go through his phone to get these texts. Defendant told the police that a friend texted him that the victim was claiming that defendant raped her, and defendant texted back: "Why is she going to lie on my name[?]" Counsel asked the court "to consider competing versions of events. Not so much for the presumption, but in terms of the weight of the evidence in determining whether any conditions can assure the safety of the community and any person."

¶ 17    In response, the ASA stated that "there is nothing in anything that we have been supplied at this point to indicate that they ever had a relationship of any kind." The victim dated defendant's friend at some point. Defense counsel stated that defendant admitted sending a nude image of the bottom half of himself to the victim. Defendant claimed that the victim sent nude photos to him, too, on Snapchat. The ASA responded that the victim said that, when she was a junior, defendant sent her a picture of his penis via Snapchat and that was when the victim removed him from her social media. The victim was a senior at the time of the incident.

¶ 18    The trial court began its ruling by noting that the State and the defense had very different accounts of what happened. However, in assessing whether the State had satisfied its burden to show that the presumption was great that defendant had committed the charged offense, the court noted (1) defendant ran from the house, which would not typically happen

after a consensual encounter; (2) the victim was crying hysterically and made an immediate outcry to her mother; (3) a witness, namely the victim's sister, heard the victim saying no and trying to get defendant off of her; and (4) the victim missed school, was withdrawn, was sleeping in her parents' room, and was acting "consistent with someone who has been sexually assaulted." As a result, the court found that the State had satisfied the presumption.

¶ 19    Next, the court found that defendant's release posed a real and present danger, first to the victim, in light of the fact that she told him to stop and still he forcibly raped her, and second to the community. The court stated that defendant was "a real and present threat to the community at large because this victim could have been anybody, anyone you encounter who is similarly situated to the victim."

¶ 20    Lastly, the court found that there were no conditions that the court could impose that would mitigate the threat posed by defendant's release. The court stated: "If I was just worried about this particular victim, I would probably be able to craft some conditions, but that's not the case." The court explained: "For you to rape someone in their basement while their family members are upstairs and you could be caught red-handed, that shows an inability to be deterred, and this occurred in the home." The court noted that, if he placed defendant on electronic monitoring, that would restrict defendant to the home but that was "the type of location where this exact offense occurred." In conclusion, the court denied pretrial release and informed defendant of his right to file a motion for relief.

¶ 21    On October 23, 2025, after the conclusion of the detention hearing, the court issued a written pretrial detention order. In the written order, the trial court found that the proof was evident or the presumption great that defendant had committed an eligible offense where the "Vic's account that she was raped is corroborated by witness" and based on "vic's immediate

outcry, and vic's demeanor (sobbing, hysterical, missing school, withdrawn, sleeping in parents' room)." The order stated that defendant posed a real and present threat to the safety of persons in the community, where "Def forcibly raped the 17 year old vic as she repeatedly said no. This demonstrates a danger not only to this vic but to others in the community."

¶ 22    The order further stated that no condition or combination of conditions can mitigate the real and present threat that defendant posed to the safety of persons in the community, where he "forcibly raped the vic while other people were in the home, showing that he is unlikely to be deterred." The order explained: "That offense also occurred within the confines of the home, showing that even electronic monitoring is unlikely to effectively mitigate the risk to the community." On November 17, 2025, defendant was indicted for the five counts listed above. See *supra* ¶ 2.

¶ 23    On November 26, 2025, private counsel filed a motion for release, which argued, among other things, that:

> "—he and the complaining witness had several previous consensual sexual encounters at her home,
>
> —upon learning he was wanted by police in this case, he surrendered himself at the 5th District police station,
>
> —he was questioned by detectives and was cooperative with their investigation,
>
> —he gave a full statement to detectives,
>
> —he voluntarily submitted a buccal swab, and
>
> —he explained that this encounter was consensual."

The motion further alleged that defendant had no contact with the victim since the incident, except for a chance encounter in a Walgreens store. On December 1, 2025, defendant filed the same motion a second time.

¶ 24    On December 1, 2025, a hearing was held on defendant's motion before a different trial judge and with a different privately retained counsel and a different ASA than the first hearing. The ASA repeated essentially the same proffer that had been given at the prior hearing in October. After listening to the State's proffer, the trial court noted that the victim was five feet five inches, while defendant was six feet, three inches. The ASA also confirmed that defendant weighed 230 pounds. The court then asked if the victim had asked the 11-year-old sister to get their mother, and the ASA confirmed that the victim had. The ASA then noted that defendant had no juvenile background and no adult history of arrests.

¶ 25    Defense counsel argued that the only evidence on the issue of force and lack of consent was the victim's own statement, since there was no physical corroboration such as injury or torn clothing. Defendant provided a full, contradictory statement, after he voluntarily walked into the police station when he learned he was wanted by them. Defendant was not picked up during the month after the incident, so the police clearly did not think he was a danger.

¶ 26    Counsel argued that defendant was invited over and defendant stated that every time he came over to her house they had a sexual encounter. Defendant admitted that she told him before he came over that she was celibate, but defendant said that she put her hand on his leg when they were sitting on the couch and things escalated from there. Defendant claimed that he and the victim had had a prior relationship within the past year. Defendant alleged that, when she put her hand on his thigh, he told her to stop because she had said she was celibate.

According to defendant, the victim kept putting her hand on his thigh, and then they started making out. Then the victim put her mouth on him and then they had vaginal sex.

¶ 27     Counsel argued that the victim was lying because her sister walked in and that was traumatic and not planned. Counsel argued that the sister did not say that she saw what was going on, but rather that she was near enough to hear. Based on the foregoing allegations, counsel asked the court to find that the State had failed to carry its burden that the presumption was great that defendant committed the crime.

¶ 28     Next, counsel argued that defendant was not a danger because over a month went by after the incident and defendant had no contact with the victim, except for passing her by in a Walgreens. Also, the police would not have let him walk around during that time if he posed a danger to others. Further, defendant was in college and a baseball player, with lots of family support.

¶ 29     Lastly, even though defendant would have "two days off of electronic monitoring," counsel argued that "GPS solves that in a case like this." Counsel noted that "even during those essential movement days," defendant still had a monitor, and the victim could have a "remote" so she would know if he was coming close.

¶ 30     The trial court asked whether they had the text messages that were mentioned during the first court appearance. Defense counsel said he did not have them because the police have defendant's phone and the defense had no other way to retrieve the messages. The court then asked about social media, and counsel replied that it was on Snapchat and no longer exists.

¶ 31     The court noted that, where their "initial interaction[ ], with them being together in that basement[,] was consensual," then "one of the most important factors is the outcry." Although defendant claimed that they had a prior sexual history, defendant also acknowledged that she

told him she was celibate, "which would obviously indicate that she did not want to have sex." In addition to being corroborated by the immediate outcry, her lack of consent was corroborated by a witness, namely the 11-year-old sister, who said she heard her sister asking him to leave. While counsel argued that the sister did not see anything, the State's prior proffer included the sister's statement that the victim was trying to get defendant off of her. The court observed that the victim's telling the sister to get their mother "sort of contradicts this notion that [the victim] is making this allegation because the 11-year old saw something." In addition to the immediate outcry and the victim being found sobbing in the basement, the court noted defendant fled from the offense. Based on all these proffered facts, the trial court found the State had satisfied its burden to show that the presumption was great that defendant had committed the offense.

¶ 32        Second, with respect to the danger issue, the court observed that the issue was not "whether the police believed he's a danger," but "whether I believe he's a danger" to the victim and the community. The court stated that it believed defendant was a danger to the victim and community based on the "multiple instances in that basement" where he forced himself upon the victim.

¶ 33        Third, the court found that electronic monitoring was not appropriate "for a case like this." The court acknowledged that, although "GPS may keep the victim and the defendant apart," it did "not keep him from victimizing another person in a vulnerable situation." The court noted that defendant was "a very large man." After reviewing the three factors, the court denied pretrial release.

¶ 34        On December 9, 2025, defendant filed a notice of appeal. On February 13, 2026, defendant filed a memo with this court, and on March 6, 2026, the State filed a response.

¶ 35                                    ANALYSIS

¶ 36          For the following reasons, we affirm the trial court's denial of defendant's motion for pretrial release.

¶ 37                    I. The Mechanics of the Proceeding and Appeal

¶ 38          All defendants are "presumed eligible for pretrial release," and so it is the State that bears the burden of overcoming this presumption if it seeks pretrial detention. 725 ILCS 5/110-6.1(e) (West 2024). To satisfy its burden, the State may present evidence at a detention hearing through witnesses (725 ILCS 5/110-6.1(f)(3) (West 2024)) or "by way of proffer based upon reliable information" (725 ILCS 5/110-6.1(f)(2) (West 2024); *Morgan*, 2025 IL 130626, ¶ 26). Similarly, the defendant may counter with evidence through witnesses or by way of proffer. 725 ILCS 5/110-6.1(f)(2), (3) (West 2024). Like the State, the defendant is limited to a proffer "based upon reliable information." 725 ILCS 5/110-6.1(f)(2) (West 2024). "The rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the hearing." 725 ILCS 5/110-6.1(f)(5) (West 2024).

¶ 39          A defendant is entitled to appeal any order denying his or her pretrial release. 725 ILCS 5/110-6.1(j) (West 2024); see Ill. S. Ct. R. 604(h)(1) (eff. Apr. 15, 2024) ("An appeal may be taken to the Appellate Court" "by the defendant from an order denying pretrial release."). However, "[a]s a prerequisite to appeal," defendant must "first present to the trial court a written motion requesting the same relief to be sought on appeal and the grounds for such relief." Ill. S. Ct. R. 604(h)(2) (eff. Apr. 15, 2024). In the case at bar, defendant satisfied this prerequisite by filing a motion for relief on November 26, 2025.

¶ 40          "[A]ny issue not raised in the motion for relief, other than errors occurring for the first time at the hearing on the motion for relief, shall be deemed waived." Ill. S. Ct. R. 604(h)(2)

(eff. Apr. 15, 2024). The motion for relief then "serve[s] as the argument of the appellant on appeal." Ill. S. Ct. R. 604(h)(7) (eff. Apr. 15, 2024). In addition, the parties are permitted to file, but are not required to file, appellate briefs. Ill. S. Ct. R. 604(h)(7) (eff. Apr. 15, 2024). In the case at bar, both parties chose to file appellate briefs.

¶ 41                                    II. Standard of Review

¶ 42        Regarding our standard of review on appeal, our supreme court has held that,

"when live witness testimony is presented at a pretrial detention hearing, the circuit court's ultimate detention decision under section 110-6.1 [(725 ILCS 5/110-6.1 (West 2024))], in addition to any underlying factual findings supporting the decision, will not be disturbed on review unless found to be contrary to the manifest weight of the evidence." *Morgan*, 2025 IL 130626, ¶ 54.

¶ 43        However, "when the parties to a pretrial detention hearing proceed solely by proffer, the reviewing court is not bound by the circuit court's factual findings and may therefore conduct its own independent *de novo* review of the proffered evidence and evidence otherwise documentary in nature." *Morgan*, 2025 IL 130626, ¶ 54.

¶ 44        The supreme court stated that *de novo* review means that the reviewing court "grant[s] no deference to the decision of the circuit court." *Morgan*, 2025 IL 130626, ¶ 22. The supreme court stressed that "the reviewing court stands in the same position as the circuit court." *Morgan*, 2025 IL 130626, ¶ 21.

¶ 45        In the case at bar, since no live witness testimony was presented, our standard of review is *de novo*, and we stand in the same position as the trial court when reviewing the record.

¶ 46                                    III. The Three Questions

¶ 47      When a defendant has been charged with a detainable offense, and the State has filed a petition for pretrial detention, the court must "make a factual determination as to whether the State presented clear and convincing proof that (1) the defendant likely committed the detention-eligible offense, (2) the defendant is dangerous, and (3) no conditions could mitigate defendant's dangerousness or risk of flight." *Morgan*, 2025 IL 130626, ¶ 41; 725 ILCS 5/110-6.1(e) (West 2024). If the answer to these three questions is " 'yes,' the court may detain the defendant." *Morgan*, 2025 IL 130626, ¶ 41.

¶ 48      To quote the statute, the State must satisfy three factors "by clear and convincing evidence": (1) that "the proof is evident or the presumption great that the defendant has committed" the charged offense; (2) that the defendant "poses a real and present threat to the safety of any person or persons or the community, based on the specific articulable facts of the case"; and (3) that "no condition or combination of conditions *** can mitigate" either the risk of the defendant's "real and present threat to the safety of any person or persons or the community, based on the specific articulable facts of the case" or the risk of his "willful flight." 725 ILCS 5/110-6.1(e) (West 2024).

¶ 49      The court may consider a variety of factors in making a determination of dangerousness, which may include, but are not limited to, the nature and circumstances of the charged offense, including whether the crime was a crime of violence or a sex offense; the history and characteristics of the defendant; any statements made by or attributed to the defendant, together with the circumstances surrounding his statements; and the age and physical condition of both the defendant and the victim. 725 ILCS 5/110-6.1(g)(1), (2), (4), (5), (6) (West 2024). Now that we must undertake the same review as the trial court, these

statutory requirements and factors apply equally to the appellate court. *People v. Opas*, 2025 IL App (1st) 250208, ¶ 37.

¶ 50    In the case at bar, there is no issue that defendant was charged with a detainable offense, namely, criminal sexual assault.[2] Criminal sexual assault is part of article 11, "Sex Offenses." 720 ILCS 5/11-1.20(a)(1) (West 2024). The pretrial detention statute provides that "any offense under Article 11 of the Criminal Code of 2012" is a detainable offense, with certain exceptions not relevant here. 725 IL CS 5/110-6.1(a)(5) (West 2024). Since there is no dispute that the charges involve a detainable offense, we proceed to analyze the three statutory factors and how they apply to this case.

¶ 51    IV. The Three Factors

¶ 52    A. Proof Evident

¶ 53    First, exercising *de novo* review, we find that the State tendered proffers at the hearings that established "by clear and convincing evidence" that "the proof is evident or the presumption great that the defendant has committed" the charged offenses. 725 ILCS 5/110-6.1(e) (West 2024). On appeal, defendant argues that this is a classic "he said, she said" case, and that, without an injury or torn clothing, there is no corroborating physical evidence.

¶ 54    However, our review shows that a number of key facts are undisputed. First, there was an immediate outcry, and the victim was found sobbing hysterically in the basement. This fact is not disputed. Second, the family took the victim to the hospital, where a rape kit was performed. The sex acts in this case are undisputed, as is the fact that it was defendant who did them. Third, there is a witness, namely, the victim's minor sibling who heard the victim's

---

[2]Defendant's motion for relief stated that he "concedes that Criminal Sexual Assault is a detainable offense."

protestations of "no." Fourth, defendant's flight from the scene is undisputed, and flight is "generally considered some evidence of a guilty mind." *People v. Aljohani*, 2021 IL App (1st) 190692, ¶ 64 (citing numerous supporting cases in the paragraph). Fifth, defendant admitted in a statement to the police that the victim told him that she was celibate, and as one of the trial judges observed, "obviously" that is inconsistent with consent. Sixth, the large disparity in size between defendant and victim is undisputed, indicating his capacity to force and overpower her.

¶ 55    Based on these facts, most of which are undisputed, we find the presumption satisfied. However, we must hasten to add that this finding, which is made for purposes of detention review only, has no effect, whatsoever, on what might later be proven at a trial and found by a fact finder.

¶ 56                                B. Dangerousness

¶ 57    Next, exercising *de novo* review, we find that the State tendered proffers at the hearings that established "by clear and convincing evidence" that the defendant "poses a real and present threat to the safety of *** the community, based on the specific articulable facts of the case." 725 ILCS 5/110-6.1(e) (West 2024). On appeal, defendant argues that he was out and about for over a month between the incident and his detention and during that time he did not reach out to the victim and harmed no one. Further, he has no prior criminal history. See 725 ILCS 5/110-6.1(g)(2)(A) (West 2024) (in determining dangerousness, a court may consider a defendant's prior criminal history or lack thereof).

¶ 58    However, defendant is accused of multiple sex offenses, perpetuated upon a victim by force, while she allegedly said no repeatedly and told him to leave. See *People v. Boadu*, 2023 IL App (1st) 211537-U, ¶ 35 ("No doesn't mean maybe. No doesn't mean convince me. No

means no."). As noted above, her account is corroborated by a witness and by subsequent events, such as her hysteria and his flight. The fact that the charged offenses are sex offenses is a factor that our legislature specifically listed for us to take into account when considering dangerousness. See 725 ILCS 5/110-6.1(g)(1) (West 2024) ("Factors to be considered in making a determination of dangerousness."). We understand our legislature's emphasis on this type of offense, given its chronic underreporting and high incidence of recidivism.

¶ 59    Another listed factor to consider is "[t]he age and physical condition of the defendant." 725 ILCS 5/110-6.1(g)(5) (West 2024). As noted above, defendant is 19 years old, six feet, three inches, tall and 230 pounds, and has the capacity to overpower a younger, smaller victim. The victim alleged that he was capable of forcing her head down on his penis until she bit him, pushing her down on the couch, with her face in the pillows, and holding her down with one hand by the back of her head, while using his other hand to pull down her pants, to forcibly rape her. We may also consider any statements defendant made. 725 ILCS 5/110-6.1(g)(4) (West 2024). In the case at bar, defendant admitted to the sex acts in question. although not the force, and admitted that the victim admonished him, prior to his coming to her home, that she was celibate.

¶ 60    Based on the proffered facts, as well as the undisputed facts, we find that defendant poses a danger to the victim and to similarly situated young women.

¶ 61                                  C. No Conditions

¶ 62    Finally, exercising *de novo* review, we find that the State tendered proffers at the hearings that established "by clear and convincing evidence" that "no condition or combination of conditions *** can mitigate" the risk of the defendant's "real and present threat to the safety of *** the community, based on the specific articulable facts of the case." 725 ILCS 5/110-

6.1(e) (West 2024). Defendant asserts that electronic monitoring, GPS, and home confinement with his mother or grandmother would be sufficient to mediate against any risk that he poses.

¶ 63 However, we observe, as did the two trial judges before us, that the acts in question occurred in a home with family members present and yet this posed no deterrent. Defendant's refusal to take no for an answer makes him a danger to this victim and others. Electronic monitoring and GPS may confirm that defendant is at home, but they do not reveal what is transpiring there. The offenses here were not street attacks but an assault inside a family residence on someone who trusted him to behave differently. Further, defendant is in college with access to women of a similar age to the victim here. Electronic monitoring and GPS are insufficient to protect other young women in the community, given the circumstances of this offense. See *People v. Simpson*, 2024 IL App (4th) 240607-U, ¶ 40 (regardless of the speed with which police react, electronic monitoring simply informs police that a defendant violated his home-confinement restriction, but does not "provide much in the way of *prevention*" (emphasis in original)).

¶ 64 Having considered all three questions separately and independently, we find that the answer to all three is "yes." See *Morgan*, 2025 IL 130626, ¶ 41 (if the answer to these three questions is " 'yes,' the court may detain the defendant").

¶ 65 CONCLUSION

¶ 66 Two different trial judges came to the same conclusion that we reach today, namely, that detention is warranted in this case. For all the foregoing reasons, and having conducted a thorough and independent *de novo* review of the record before us, we affirm the trial court's order denying defendant's motion for relief and affirm the trial court's denial of pretrial

detention. Our opinion does not bar the trial court, in its discretion, from choosing to hold a further pretrial detention hearing as additional discovery materials become available.

¶ 67          Affirmed.

*People v. Reyes*, 2026 IL App (1st) 252639

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 25-CR-12904; the Hon. Ankur Srivastava and the Hon. Jennifer Coleman, Judges, presiding. |
| **Attorneys for Appellant:** | Logan C. Bierman and Joshua B. Kutnik, both of Chicago, for appellant. |
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (Becky Walters, Special Assistant State's Attorney, of counsel), for the People. |